23CA1572 Peo v Lovins 08-06-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1572
Pueblo County District Court No. 21CR9
Honorable Amiel Markenson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Eddie B. Lovins,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Yun and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 6, 2026

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1　　Eddie B. Lovins appeals his conviction on two counts of first degree assault for threatening a peace officer with a deadly weapon, two counts of second degree assault for causing injury with a deadly weapon, and one count of criminal mischief.  We affirm.

## I.　　Background

¶ 2　　A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3　　One week after a bomb exploded in Nashville, Tennessee, authorities in that state received a phone call reporting a bomb at the state capitol.  During a series of additional calls, the caller identified himself as Lovins.

¶ 4　　Lovins told the Tennessee authorities to send only federal, rather than state, law enforcement officers to his residence in Pueblo, Colorado.  He said that, if a state officer was dispatched, he would be "legally obligated to dummy [his] ass" and would "shoot his ass right there on the front step."

¶ 5　　In coordination with Tennessee authorities, the Pueblo County Sheriff's Office dispatched Sergeant Joshua Rude and Deputies Byron Franklin and Nicolas Berumen to conduct a welfare check at Lovins's residence (the house).  Their first two attempts to contact

Lovins at the house were unsuccessful. On the officers' third attempt, Lovins's neighbor Benjamin Blackmore informed them that he had received texts from Lovins throughout the day, feared Lovins was intoxicated, knew where Lovins kept a spare key to the house, and wanted to check on him. Blackmore led the officers to the side of the house, where Lovins kept the key. When Blackmore crouched to access the key, several shots were fired from inside the house.

¶ 6    Sergeant Rude heard "a loud bang" and felt "extreme pain to [his] head." He had been struck by shrapnel, and Deputy Berumen was hit by shrapnel in the cheek. The officers did not return fire and retreated to await backup.

¶ 7    Deputy Dylan Jacketta and Wildlife Officer Eric Harper arrived near the house and took cover behind Deputy Jacketta's truck. They saw Lovins step out of the house with a rifle. Lovins turned, raised the rifle, and fired several volleys in their direction, with at least one round striking the truck.

¶ 8    Lovins eventually returned inside, then reemerged carrying only a bottle of whiskey. Officers subdued him using bean bag

rounds and placed him under arrest. Lovins was "heavily intoxicated" at the time of his arrest.

¶ 9 Lovins was charged with four counts of first degree assault for threatening a peace officer with a deadly weapon; four counts of second degree assault for causing injury with a deadly weapon; one count of making a false report of explosives, weapons, or harmful substances; and one count of criminal mischief.

¶ 10 A year and a half before trial, Lovins entered a plea of not guilty by reason of insanity (NGRI), prompting the trial court to order a sanity evaluation. Dr. Juan Sosa, a court services forensic evaluator, submitted a report (the sanity evaluation) after evaluating Lovins. Dr. Sosa concluded that, although Lovins had post-traumatic stress disorder (PTSD) resulting from his Army combat experience, he was not legally insane when he fired at the officers.

¶ 11 Seven months later, Lovins provided notice under section 16-8-107(3)(b), C.R.S. 2025, of his intent to introduce mental condition evidence at trial. The parties agreed that no further mental health evaluation was necessary and that the previously completed sanity evaluation would serve as the mental condition

examination of Lovins for purposes of section 16-8-107(3)(b). At trial, defense counsel argued that Lovins lacked the intent to assault the officers because of his PTSD.

¶ 12    The jury acquitted Lovins of the two counts of first degree assault and the counts of second degree assault (peace officer) as to Deputy Berumen and Sergeant Rude, whom Lovins had fired upon through the closed front door without checking who was outside the house. The jury also acquitted Lovins of making a false report of explosives. However, the jury found Lovins guilty of the counts of second degree assault (causing injury with a deadly weapon) as to Deputy Berumen and Sergeant Rude. In addition, the jury found Lovins guilty of two counts of first degree assault as to Deputy Jacketta and Officer Harper, as well as criminal mischief.

¶ 13    On appeal, Lovins contends:

- The trial court violated his due process rights by failing to provide him with an evaluation of his mental condition — and not just his sanity — even though it ordered a mental health evaluation under section 16-8-107(3)(b).

- The court improperly rejected the defense's jury instructions explaining Lovins's mental condition defenses and the procedures for presenting an NGRI argument, and it failed to sua sponte provide the jury with a self-defense instruction.

- The court improperly allowed Detective Amy Lile to provide opinion testimony regarding the meaning of "dummy their ass."

- The evidence was insufficient to support his convictions for first degree assault against Deputy Jacketta and Officer Harper.

- The court improperly excluded testimony about his marksmanship.

- The cumulative impact of these errors deprived him of a fair trial.

## II. Analysis

### A. Lovins Waived His Mental Health Evaluation Argument

¶ 14 The People argue that Lovins waived his argument regarding a mental health evaluation because he did not request, and the trial court did not order, a separate mental health evaluation. Lovins,

however, maintains that he preserved the issue when, three months before trial, he provided notice under section 16-8-107(3)(b) of his intent to introduce mental condition evidence.

¶ 15     We agree with the People that Lovins waived this argument.

¶ 16     After Lovins entered his NGRI plea, at his request, the court ordered a sanity evaluation in October 2021.  Dr. Sosa submitted the sanity evaluation in June 2022, ten months before trial.  As noted above, Dr. Sosa's sanity evaluation concluded that, although Lovins had PTSD, he was not legally insane.

¶ 17     Seven months after Dr. Sosa completed the sanity evaluation, Lovins filed notice of his intent to introduce evidence of his mental condition under section 16-8-107(3)(b).  The statute provides that

> [r]egardless of whether a defendant enters a plea of [NGRI] pursuant to section 16-8-103, [C.R.S. 2025,] the defendant is not permitted to introduce evidence in the nature of expert opinion concerning the defendant's mental condition without having first given notice to the court and the prosecution of the defendant's intent to introduce the evidence and without having undergone a court-ordered examination pursuant to section 16-8-106[, C.R.S. 2025].

¶ 18     Lovins asserts that, in response to his notice, the trial court properly "ordered an evaluation pursuant to [section] 16-8-107(3)"

6

but erred by "fail[ing] to enter an order to direct how and when the evaluation would occur, as well as such further and other examinations that were needed." This argument does not accurately reflect the proceedings that followed Lovins's filing of his notice, however.

¶ 19    At Lovins's request, the trial court conducted a hearing on the notice. During the hearing, the court acknowledged that section 16-8-107(3)(b) ordinarily requires the court to "[o]rder a mental health evaluation." The court noted that such an evaluation is "usually" conducted concurrently with an NGRI evaluation but that, in this case, Lovins had already completed a sanity evaluation.

¶ 20    The court then asked, "Would the defense be okay with accepting the [sanity evaluation] as the evaluation for [section 16-8-107(3)(b) purposes] so that we don't have to toll timeframes, probably for about, another six months to a year and order a new one?" Defense counsel responded unequivocally, "Yes, Judge."

¶ 21    The record thus shows that, contrary to Lovins's argument, the court did not order a new mental health evaluation after Lovins submitted his notice. Accordingly, any claim of error based on Lovins's mistaken assumption that the trial court ordered a new

mental health evaluation is unfounded, and we need not address it further.

¶ 22    Second, we conclude that Lovins waived his argument that the court erred by relying on the sanity evaluation to satisfy section 16-8-107(3)(b).

¶ 23    Waiver, the "intentional relinquishment of a known right or privilege," extinguishes any claim of error and, in turn, precludes appellate review. *People v. Rediger*, 2018 CO 32, ¶ 40, 416 P.3d 893, 902. To show that defense counsel knowingly waived a relinquished right or privilege, "some evidence of recognition is required," *People v. Garcia*, 2023 COA 58, ¶ 21, 536 P.3d 847, 853, unless the surrounding context leaves "'no reasoned doubt that counsel recognized' the right at stake," *id.* (quoting *People v. Tee*, 2018 COA 84, ¶ 29, 446 P.3d 875, 882). Appellate courts are more inclined to find that defense counsel intentionally relinquished a known right when the record shows a strategic purpose for doing so. *Id.* at ¶ 23, 536 P.3d at 853. However, such a showing is not required. *Id.* at ¶ 24, 536 P.3d at 853.

¶ 24    The record supports both a knowing relinquishment and a strategic purpose. Defense counsel was indisputably aware that he

could request a new mental health evaluation under section 16-8-107(3)(b), as the court referenced this process during the hearing on the notice. The court noted that "the statute require[d] . . . that [it] [o]rder a mental health evaluation" but then asked counsel for both parties whether they would agree to "accept[] the [sanity] [e]valuation" as the mental health examination to avoid a "six month[] to a year" delay in the proceedings. The record shows that defense counsel expressly consented to using the sanity evaluation as the mental health evaluation to avoid delaying the trial, particularly as Lovins remained in custody pending trial.

¶ 25      Thus, Lovins waived his argument that the trial court erred by not ordering a separate section 16-8-107(3)(b) evaluation. As a result, Lovins's argument is unreviewable. *See Rediger*, ¶ 40, 416 P.3d at 902.

### B.    The Court Did Not Err by Not Giving the Subject Jury Instructions

¶ 26      Lovins raises three claims of instructional error. He preserved two of them — his arguments regarding his proposed mental condition instruction and his proposed instruction on the

9

procedures for asserting an NGRI defense.  But he did not preserve his argument concerning a self-defense instruction.

### 1.    Preserved Contentions

#### a.    Standard of Review

¶ 27    "We review jury instructions de novo to determine whether they accurately informed the jury of the governing law, but we review questions of form and style for an abuse of discretion." *People v. Sabell*, 2018 COA 85, ¶ 11, 452 P.3d 91, 95.  As long as the instructions "properly inform the jury of the law, the trial court has 'broad discretion to determine the form and style'" of those instructions.  *People v. Lopez*, 2018 COA 119, ¶ 35, 488 P.3d 373, 380 (quoting *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011)).

¶ 28    "A trial court abuses its discretion when it misconstrues or misapplies the law, or when its decision is manifestly arbitrary, unreasonable, or unfair."  *People v. Knapp*, 2020 COA 107, ¶ 31, 487 P.3d 1243, 1252.

#### b.    Mental Condition Instruction

¶ 29    Lovins first argues that the trial court erred by refusing to give an instruction stating, "Evidence concerning the defendant's mental condition has been introduced during the trial.  You should

consider this evidence in determining whether the prosecution has proven beyond a reasonable doubt that the defendant acted with the requisite culpable mental state."

¶ 30    Defense counsel argued that the trial court was required to give the mental condition instruction because it mirrored the language of section 16-8-107(3)(b) and was consistent with the supreme court's analysis in *Hendershott v. People,* 653 P.2d 385, 391 (Colo. 1982).

¶ 31    The trial court rejected the mental condition instruction for "a number of reasons." The court said:

- Although *Hendershott* recognized that defendants may present evidence to negate their mental culpability, "[t]hey also have a right to present evidence to negate every other element," and "[t]hat doesn't mean they get a jury instruction on each one."

- The mental condition instruction was "covered by multiple other jury instructions," including the insanity instruction, which directed the jury to consider whether a mental disease or defect prevented Lovins from forming the culpable mental state required for the charged

11

offenses and placed on the prosecution the burden to disprove insanity beyond a reasonable doubt; the instruction stating that the prosecution bears the burden of proving every element of the charged counts beyond a reasonable doubt; and the instruction explaining that the jury could convict Lovins only if it found that he engaged in a voluntary act "together with a culpable state of mind."

- The mental condition instruction would be "confusing, duplicative, and not appropriate" and "would highlight one area of the law more than others that are already covered."

¶ 32    We agree that the proposed mental condition instruction would have improperly highlighted the mental condition evidence. "[I]nstructions that emphasize specific evidence are generally disfavored." *People v. Garcia*, 2021 COA 65, ¶ 46, 493 P.3d 929, 937, *aff'd*, 2023 CO 41, 530 P.3d 1200. A trial court "'has no duty to select all the salient points in the evidence, favorable and unfavorable, and specifically call them to the attention of the jurors,' because such pointed instructions tend to confuse the jury

12

and result in incorrect directives regarding evidentiary weight." *Krueger v. Ary*, 205 P.3d 1150, 1157 (Colo. 2009) (quoting *Lowe v. People*, 234 P. 169, 174 (Colo. 1925)).

¶ 33    Significantly, Lovins does not point to a single Colorado case holding that a trial court abused its discretion by rejecting an instruction highlighting specific evidence.  Indeed, in the very case on which he relies, *People v. Neckel*, 2019 COA 69, ¶ 31, 487 P.3d 1036, 1043-44, the division affirmed the trial court's refusal to give such an evidentiary instruction.

¶ 34    Lovins appears to argue that the trial court was required to give the mental condition instruction solely because it correctly stated the law.  But that is not the proper standard.  While jury instructions must accurately state the law, a court is not obligated to give every accurate instruction.  *See id.* at ¶ 31, 487 P.3d at 1044 ("[A] court may refuse an instruction that states principles already encompassed elsewhere in the court's instructions.").

¶ 35    Because Lovins identified no authority requiring the trial court to give the mental condition instruction, the decision to accept or reject it remained within the trial court's broad discretion.  *See Lopez*, ¶ 35, 488 P.3d at 380.  In addition, Lovins offers no legal

support for his argument that the court's reasons for declining to give the mental condition instruction were arbitrary, unreasonable, unfair, or reflected a misunderstanding or misapplication of the law. *See Knapp,* ¶ 31, 487 P.3d at 1252. He has therefore failed to establish that the court abused its discretion by rejecting the mental condition instruction. *See id.*

### c. NGRI Instruction

¶ 36 Next, Lovins argues that the court erred by refusing to give his proposed instruction stating that he "was required by law to plead [NGRI] in order to introduce evidence of his [PTSD] as it relate[d] to whether or not he formed the culpable mental state in the offenses alleged in this case." The trial court declined to give this instruction, concluding that it misstated the governing law by suggesting that a defendant must plead NGRI to introduce mental condition evidence.

¶ 37 Although the trial court rejected the NGRI instruction for reasons different from those for rejecting the mental condition instruction, the former suffers from the same defects as the latter. Lovins cites no authority to support his argument that the court was required to give the NGRI instruction. The NGRI instruction

addressed a procedural matter that, as the prosecutor correctly noted, was "not particularly relevant to the [j]ury's consideration" and posed the risk of confusing the jury.

¶ 38 Thus, we affirm the trial court's rejection of the NGRI instruction, albeit on other grounds. *See LePage v. People*, 2014 CO 13, ¶¶ 2, 12, 25, 320 P.3d 348, 349, 351, 354.

### 2. Self-Defense Instruction

¶ 39 Lovins argues that the trial court plainly erred by failing, sua sponte, to instruct the jury on the affirmative defense of self-defense. We disagree.

¶ 40 Six months before trial, Lovins listed "[s]elf-defense" as an "[a]dditional potential [d]efense[]." But he subsequently mentioned self-defense only once again — in passing. Lovins never referred to self-defense at any of the hearings conducted in the case or at trial. The term "self-defense" does not appear in any of the thirty-one transcripts in the record.

¶ 41 Although Lovins points to trial evidence that he claims could have supported a self-defense argument, defense counsel never asserted that Lovins acted in self-defense, much less requested a self-defense instruction. Instead, counsel relied on that same

15

evidence, together with evidence of Lovins's PTSD, to argue that the prosecution had not proved the mens rea elements of the charged offenses beyond a reasonable doubt.

¶ 42     Because Lovins failed to preserve this issue, we review for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. "Plain error is obvious and substantial." *Id.* Under the plain error standard, the defendant bears the burden of establishing that an error occurred and that it was "obvious and substantial." *Kaufman v. People*, 202 P.3d 542, 549 (Colo. 2009) (quoting *People v. Weinreich*, 119 P.3d 1073, 1078 (Colo. 2005)).

¶ 43     For an error to be obvious, it must violate a well-settled legal principle, statutory mandate, or controlling Colorado precedent. *People v. Dominguez*, 2026 CO 30M, ¶ 20, ___ P.3d ___, ___. Yet Lovins identifies no such authorities. Tellingly, Lovins cites no case in which an appellate court held that the trial court plainly erred by failing sua sponte to provide a self-defense instruction, and we are aware of none.

¶ 44     Lovins cites *People v. Wade*, 2024 COA 13, 548 P.3d 1164, to support his assertion that the court plainly erred by failing to

instruct the jury on self-defense. But *Wade* demonstrates why Lovins's argument on the self-defense instruction fails.

¶ 45    In *Wade,* the defendant initially asserted self-defense but never mentioned it at trial, introduced no evidence to support it, and did not request a self-defense instruction. *See id.* at ¶ 9, 548 P.3d at 1167. The division held that the trial court "did not err, plainly or otherwise," by declining to sua sponte instruct the jury on a defense the defendant "appeared to abandon" and that was supported only by "thin" evidence. *Id.* at ¶¶ 17-18, 548 P.3d at 1168.

¶ 46    As in *Wade,* the record in this case shows that defense counsel made a "tactical decision not to submit a self-defense instruction." *Id.* at ¶ 16, 548 P.3d at 1168.

¶ 47    The *Wade* division explained why counsel's conduct in that case was tactical: Counsel had "endorse[d] . . . two affirmative defenses" yet "did not mention self-defense during . . . opening statement," elicited only "unfavorable evidence," and ultimately "did not request or tender a self-defense instruction." *Id.* at ¶¶ 9, 16, 548 P.3d at 1167-68. The division concluded that, under those circumstances, the defense "appeared to abandon" self-defense, and thus counsel had made a "tactical decision not to submit" such an

17

instruction.  *Id.* at ¶¶ 16-17, 548 P.3d at 1168.  Similar facts are present here: Counsel identified self-defense as a potential defense months before trial but never mentioned it again, elicited no evidence to support it, relied instead on a mens-rea-based theory of defense, and tendered other instructions while deliberately omitting a self-defense instruction.  This record, like the one in *Wade*, demonstrates that counsel's decision not to pursue a self-defense instruction was tactical.

¶ 48     And as in *Wade*, at most, only "tenuous" evidence supported a self-defense theory.  *Id.* at ¶ 14, 548 P.3d at 1168.

¶ 49     Lovins's possible self-defense argument rested on his assertion that "[he] shot from inside [the house] only knowing that there were people outside of his house rummaging around."  Lovins does not explain how this scenario could support a self-defense theory.  Nor does he explain how he could have been acting in self-defense when he shot at Deputy Jacketta and Officer Harper, who arrived at the house after Lovins had wounded Sergeant Rude and Deputy Berumen, never fired at Lovins, and were positioned more than a hundred yards away from the house.

¶ 50    Thus, we reject Lovins's argument that the trial court plainly erred by failing to sua sponte give a self-defense instruction.

### C.    The Trial Court Did Not Err by Allowing Detective Lile to Explain the Meaning of "Dummy Their Ass"

#### 1.    Additional Facts

¶ 51    The jury heard a recording of Lovins's conversation with Tennessee law enforcement officers in which he said that, if Tennessee officers appeared at the house, he would "dummy their ass right there on the front step."  He continued, "I'm legally obligated to do that. . . .  If you send one of your state representatives here to Colorado, I'm legally obligated to dummy their ass.  I will shoot his ass right there on the front step."

¶ 52    The prosecutor asked Detective Lile, the prosecution's advisory witness, about the meaning of "dummy their ass":

> [PROSECUTOR]: [H]ave you heard the statement, dummy their ass, before?
>
> [DETECTIVE LILE]: Yes, I have.
>
> [PROSECUTOR]: What does — to your understanding, what does dummy your ass mean?
>
> [DETECTIVE LILE]: It means, whoever is saying it, they are intending to kill that person.

Lovins did not object to these questions.

19

### 2. Detective Lile's Explanation of "Dummy Their Ass" Was Not Improper Expert Testimony

¶ 53    Lovins claims that Detective Lile's explanation of the phrase "dummy their ass" amounted to improper expert testimony because it relied on "specialized knowledge" gained from her law enforcement experience and, therefore, exceeded the scope of permissible lay opinion testimony under CRE 701.  We disagree.

¶ 54    CRE 701 provides that a lay witness's opinion testimony is limited to opinions or inferences that are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or determining a fact in issue.  It cannot be based on scientific, technical, or other specialized knowledge falling within the scope of CRE 702.  The key threshold question is whether the witness's opinion derives from ordinary experience or from specialized knowledge.  *People v. Ramos*, 2017 CO 6, ¶ 8, 388 P.3d 888, 890-91.

¶ 55    But the jury did not need Detective Lile's guidance to understand what Lovins meant by "dummy their ass."  A layperson could readily discern the term's meaning from its context in Lovins's statements to the Tennessee authorities.  In the same

breath in which he used the phrase, Lovins explicitly warned that he would "shoot" Tennessee law enforcement officers' "ass[es] right there on the front step" if they came to the house. This statement made clear that "dummy[ing]" referred to a threat to shoot and kill any Tennessee officer who approached the house. The jury needed no specialized knowledge or law enforcement training to understand that meaning.

¶ 56    Because the phrase's meaning was apparent from its context, Detective Lile's explanation of "dummy their ass" did not transform her testimony into expert opinion.

> D.    Sufficient Evidence Established that Lovins Threatened
> Deputy Jacketta and Officer Harper with a Deadly Weapon

> 1.    Standard of Review

¶ 57    "We review the record de novo to determine whether the evidence presented was sufficient in both quantity and quality to sustain a defendant's conviction." *McCoy v. People*, 2019 CO 44, ¶ 63, 442 P.3d 379, 392. A conviction cannot stand if the evidence is insufficient. *Id.* at ¶ 20, 442 P.3d at 385.

¶ 58    But a conviction must be upheld if "the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light

most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)).

¶ 59     In making this assessment, an appellate court "must give the prosecution the benefit of every reasonable inference which may be fairly drawn from the evidence." *Id.* at 1292.  It may not act as a "thirteenth juror" by reweighing the evidence.  *Id.* at 1293.  Nor may it evaluate witness credibility or resolve conflicting testimony — tasks reserved exclusively for the jury.  *Id.*  Accordingly, "[w]here reasonable minds could differ, the evidence is sufficient to sustain a conviction." *People v. Lawrence*, 2019 COA 84, ¶ 23, 487 P.3d 1066, 1073 (quoting *People v. Carlson*, 72 P.3d 411, 416 (Colo. App. 2003)), *aff'd*, 2021 CO 28, 486 P.3d 269.

2.     Lovins's First Degree Assault Convictions Are Supported by Sufficient Evidence

¶ 60     Lovins argues that his first degree assault convictions are unsupported by sufficient evidence and should be reversed.  We disagree.

¶ 61    As relevant here, a person commits first degree assault if,

> [w]ith intent to cause serious bodily injury
> upon the person of a peace officer, . . . [he]
> threatens with a deadly weapon a peace officer
> . . . engaged in the performance of [his] duties,
> and the offender knows or reasonably should
> know that the victim is a peace officer . . .
> acting in the performance of [his] duties.

§ 18-3-202(1)(e), C.R.S. 2025.

¶ 62    A "threat" is "'a statement' or 'declaration' of 'purpose or intent to cause injury or harm to [a] person . . . by the commission of an unlawful act.'" *People v. Denhartog*, 2019 COA 23, ¶ 17, 452 P.3d 148, 154 (quoting *People v. Hickman*, 988 P.2d 628, 636 (Colo. 1999)).  This includes nonverbal acts.  *Id.* at ¶ 28, 452 P.3d at 155.

¶ 63    Lovins concedes that he shot a rifle "toward" Deputy Jacketta and Officer Harper.  But this characterization minimizes the seriousness of Lovins's conduct:

- Deputy Jacketta parked his truck about 120 to 140 yards from the house, where he and Officer Harper took cover behind it.

- Within minutes, Officer Harper saw Lovins exit his house with a rifle.

23

- When Deputy Jacketta "took a quick peek" at Lovins, "a volley of fire followed." Officer Harper testified that Lovins "turned, looked in [the officers'] direction, raised the rifle, and began firing."

- Lovins's initial volley included as many as five shots.

- Lovins then "stopped[,] . . . moved around, . . . raised his rifle[,] and shot again." Officer Harper recalled three distinct groups of shots.

- At least one round struck Deputy Jacketta's truck while the officers sheltered behind it. Other rounds passed nearby, audibly "whizzing, buzzing" through the air.

¶ 64    By firing multiple volleys of rifle shots at Deputy Jacketta and Officer Harper, Lovins conveyed his purpose or intent to cause them injury or harm with a deadly weapon. *See id.* at ¶¶ 17, 28, 452 P.3d at 154-55.

¶ 65    Nevertheless, relying on *Denhartog,* Lovins contends that the prosecution proved that he committed only "an act that placed [Deputy] Jacketta and [Officer] Harper at risk of harm," which Lovins argues is insufficient to establish that he "threatened" the officers.

¶ 66    In *Denhartog*, the division held that evidence showing that, during a traffic stop, the defendant suddenly and without warning reversed his car into an unsuspecting officer's motorcycle parked directly behind him was insufficient to establish that he had threatened the officer. *Id.* at ¶¶ 25-29, 452 P.3d at 155.

¶ 67    This conclusion follows naturally from the facts in *Denhartog*. There, the defendant's sudden, unexpected reversal into an officer's motorcycle supported an inference of only an intent to cause harm, not an intent to threaten the officer. *See id.*

¶ 68    But the circumstances here are materially different. Lovins fired several shots during multiple volleys, repositioning between volleys and shooting from different vantage points. He struck Deputy Jacketta's truck and sent other rounds close enough for Deputy Jacketta and Officer Harper to hear them "whizzing" by — yet did not hit either officer. And unlike the officer in *Denhartog*, ¶ 25, 452 P.3d 148, 155, who never saw the defendant's vehicle approaching, Deputy Jacketta and Officer Harper knew they were being shot at.

¶ 69    The jury recognized that Lovins's actions toward Sergeant Rude and Deputy Berumen were materially different from his

actions toward Deputy Jacketta and Officer Harper. Thus, it acquitted Lovins of threatening the two former officers, who — like the victim in *Denhartog* — were unaware of any threat until they faced actual harm, but convicted him of threatening the latter two officers.

¶ 70　Viewed in the light most favorable to the prosecution, the evidence amply supported the jury's conclusion that Lovins threatened Deputy Jacketta and Officer Harper with a deadly weapon.

### E.　The Trial Court Properly Excluded Evidence that Lovins Was "[a] [P]retty [G]ood [S]hot"

#### 1.　Standard of Review

¶ 71　"We review a trial court's evidentiary rulings for an abuse of discretion." *Rojas v. People*, 2022 CO 8, ¶ 16, 504 P.3d 296, 302.

#### 2.　Additional Facts

¶ 72　In his opening statement, defense counsel told the jury it would hear about Lovins's "incredible shooting skill" — that he was "[t]he person [who] was counted upon in his platoon to make the tough shot whenever it was required," and that he shot "better in the range" than qualified snipers.

¶ 73    But at trial, the defense offered no such evidence, despite

calling three witnesses who had served with Lovins in the Army.

¶ 74    Instead, defense counsel attempted to cross-examine

Blackmore, a prosecution witness, about Lovins's marksmanship:

> [DEFENSE COUNSEL]: Did you guys ever go
> shooting?
>
> [BLACKMORE]: Yeah.  We — [Lovins] went
> with me one time when we had our rifles
> before elk season.
>
> [DEFENSE COUNSEL]: How was that
> experience?
>
> [BLACKMORE]: It was fine.
>
> [DEFENSE COUNSEL]: Did you notice or
> remark anything about [Lovins's] skill set or
> skill at shooting?
>
> . . . .
>
> [BLACKMORE]: He was a pretty good shot.

¶ 75    When the prosecutor objected to the relevance of this line of

questioning, defense counsel responded, "It's foundational, Judge.

My next set of questions [has] to do with how they bonded.  They

were both ex-military veterans.  That conversation came up when

they would go shooting."

¶ 76    The court sustained the prosecutor's objection, explaining, "It doesn't make them better friends because he's a good or bad shot or anything like that. . . . [T]he reasons you gave me were not relevant."

¶ 77    Defense counsel responded that "the specific intent element of the first-degree assault specifically require[d] that [it] [wa]s [Lovins's] intent to shoot and cause injury," but did not explain how this made Lovins's marksmanship relevant. In any event, the court noted that Blackmore's observations of Lovins's marksmanship while sober were not relevant because Lovins was "intoxicated" when he fired at the officers. The court therefore sustained the relevance objection and struck Blackmore's testimony that Lovins was "a pretty good shot."

¶ 78    Although the court told defense counsel that he could "lay additional foundation," defense counsel chose to move on to another topic. Lovins did not make a further attempt to lay a foundation for the admission of Blackmore's statement.

### 3.    Lovins's Relevance Argument Fails

¶ 79    "Relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." CRE 401. "Evidence which is not relevant is not admissible." CRE 402.

¶ 80 On appeal, Lovins contends for the first time that Blackmore's testimony was crucial to "dispute that [Lovins] acted with intent by demonstrating that [Lovins] was a skilled shooter, and therefore, could have struck the alleged victims if he chose to do so, but based on his skill as a shooter, he chose not to do so, and therefore did not form the requisite" intent to injure them. We disagree.

¶ 81 Lovins cannot cure the inadequate evidentiary foundation for the admissibility of Blackmore's statement by raising a new relevance argument on appeal that he did not present to the trial court. At trial, defense counsel never connected Lovins's marksmanship to his mens rea when he fired at the law enforcement officers, even after the trial court indicated that it would consider allowing Blackmore's statement if defense counsel laid a sufficient foundation. On appeal, Lovins cannot rely on a new theory to challenge the court's evidentiary ruling. *See People v. Saiz*, 32 P.3d 441, 448 (Colo. 2001).

¶ 82    In any event, we agree with the trial court that, given the minimal foundation that defense counsel laid at trial, Blackmore's assertion that Lovins was "a pretty good shot" was irrelevant to whether Lovins intended to injure any of the law enforcement officers when he fired at them while intoxicated. *See People v. Gerle*, 2026 CO 53, ¶ 28, ___ P.3d ___, ___ ("Evidence that is too remote in logical relation to a matter in dispute should not be admitted.").

¶ 83    For these reasons, we affirm the trial court's exclusion of Blackmore's testimony that Lovins was "a pretty good shot."

### F.    There Was No Cumulative Error

¶ 84    An appellate court may reverse under the cumulative error doctrine only "when numerous errors in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 26, 443 P.3d 1007, 1012. "[A] single error is insufficient to reverse under the cumulative error standard." *People v. Thames*, 2019 COA 124, ¶ 69, 467 P.3d 1181, 1194.

¶ 85    As explained above, Lovins has not shown that any error occurred in this case, and, even if the trial court erred by declining

to give a sua sponte self-defense instruction, that single alleged error could not constitute cumulative error.  *See id.*

### III.   Disposition

¶ 86    The judgment is affirmed.

JUDGE YUN and JUDGE SCHUTZ concur.